Filed 10/16/23  In re B.B. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re B.B., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B325584 (Super. Ct. No. 20JD-00133) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JANE B.,<br><br>    Defendant and Appellant. | |

Jane B. (mother) appeals from the juvenile court's orders (1) refusing to return her then 14-year-old (now 15-year-old) daughter, B.B., to mother's physical custody; (2) terminating reunification services as to B.B.; (3) placing B.B. with her presumed father, C.M., and (4) requiring that mother's visitation with B.B. be supervised.  The orders were made after a contested

18-month permanency review hearing (18-month hearing) conducted in December 2022.

The juvenile court did not set a Welfare and Institutions Code section 366.26 hearing.[1]  Therefore, the orders are directly appealable.  (See § 395, subd. (a)(1); *In re T.G.* (2010) 188 Cal.App.4th 687, 692 ["'[T]he court's dispositional and following orders are directly appealable, with the exception of an order scheduling a selection and implementation hearing under section 366.26 . . .'"]; *In re X.Z.* (2013) 221 Cal.App.4th 1243, 1248-1249.)

Mother contends the orders are "unsubstantiated by the evidence, not in the best[] interest[] of B.B., and made in an abuse of the discretion of the juvenile court."  We affirm.

*Factual and Procedural Background for Period up to*
*April 2022 Order Removing B.B. from Mother's Custody*

In a prior unpublished opinion, *In re D.H. et al.* (June 20, 2023, B320188), we affirmed the juvenile court's April 2022 order removing mother's three children, including B.B., from her physical custody.  The juvenile court ordered that family reunification services be provided to mother.  We take judicial notice of the opinion and record in the prior appeal.  (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)  The following factual and procedural summary is taken from pages 2-8 of the opinion:

"[Mother and Jeremy H. (Jeremy)] are the parents of D.H., who was born in 2014.  Mother is also the parent of Z.M., born in 2004, and B.B., born in 2008.  Jeremy is not the father of Z.M. or B.B.  C.M. [is] the presumed father of Z.M. and B.B. . . . .  All of the children are female.

---

[1]All statutory references are to the Welfare and Institutions Code.

2

"In August 2020 a juvenile dependency petition was filed. It alleged that the children came within the jurisdiction of the juvenile court because their parents had failed 'to supervise or protect the child[ren] adequately' and 'to provide the child[ren] with adequate food, clothing, shelter, or medical treatment.' Furthermore, [mother and Jeremy] were unable 'to provide regular care for the child[ren] due to [their]' . . . mental illness . . . or substance abuse.'

"According to the petition, on August 18, 2020, a social worker and deputy sheriff visited the home where [mother and Jeremy] resided with the children. 'The condition of the home posed concern for the health and safety of the children. The home had rat feces throughout the entire house, bugs on the inside of the refrigerator, counters, and on the trash. There was trash and chest height debris scattered throughout the entire home and on the property outside. There were narrow paths to walk throughout the home; however, the home had so much debris that it was nearly impossible to determine the intended purpose for each room. Some of the rooms were inaccessible due to the debris and trash. The children presented with dirty skin and clothing, including having an odor.'

"The petition continued, 'There are . . . concerns about the mental health of both parents [Jeremy and mother]. During previous investigations, the parents have discussed being diagnosed with various mental health concerns. In addition, the parents refused to submit to a drug test during the current investigation, causing concerns for possible substance abuse.'

"In December 2020 the juvenile court found true the petition's allegations. The court stated: '[T]here is a preponderance of the evidence that, in fact, . . . the children were

3

living at [mother's and Jeremy's] home, that it was in pretty abysmal condition.  There were rat feces at the time of detention.  There was trash piled chest high.  The children were in poor hygiene . . . and this wasn't the first time that this issue had been reported.  It's not something that came out of the blue.  In fact, those concerns have been there for a long time . . . .  So there's no question I should take jurisdiction of the case and I will, and that will be of all three kids.'

"The children were adjudged dependent children of the juvenile court within the meaning of section 300, subdivision (b).  The court placed the children 'in family maintenance with [mother] and Jeremy.'  But it directed 'that the place of [family maintenance] is to be at Jeremy's mother's [i.e., D.H.'s paternal grandmother's] house . . . until such time as the appropriate health and land use authorities approve [mother's and Jeremy's] residence to be habita[ble] and then the children can move back in at that residence.'

"In February 2021 the San Luis Obispo County Department of Social Services (DSS) filed a supplemental petition pursuant to section 387.  This was the first of two section 387 petitions. . . .

"The first section 387 petition alleged: '[A]t the last Court hearing on December 16, 2020,' mother had stated that 'the family home [mother's and Jeremy's residence] would be ready for the children to reside in within two weeks.'  'On January 22, 2021, the assigned social worker responded to the parent[s]' home unannounced as she had been unable to make contact with the parents via telephone and text message.  The home was found to be cluttered with boxes, miscellaneous items piled high, broken windows, and the outside of the home continues to be cluttered

4

and overwhelmed with items.  The social worker was not allowed entry into the home. . . .'

"In March 2021 the juvenile court sustained the first section 387 petition.  It found 'that the prior disposition was ineffective in family maintenance and that we need a different plan.'  It removed the children from [mother's and Jeremy's] physical custody and 'place[d] them . . . in the care of their grandmother.'  It ordered that family reunification services be provided to [mother, Jeremy, and C.M., the presumed father of B.B. and Z.M].

"In September 2021 the juvenile court ordered the children 'placed, effective immediately, in the care and custody of' [mother and Jeremy].  It directed DSS to 'provide family maintenance services.'

"On April 1, 2022, DSS filed a second section 387 supplemental petition.  The petition alleged that [mother and Jeremy] had failed to provide the children 'with adequate care due to concerns regarding the parents' mental health and possible substance abuse issues.'  [Mother and Jeremy] failed to participate in random drug testing.  Jeremy tested positive for THC (tetrahydrocannabinol), 'the psychoactive element in marijuana or cannabis.'  (*People v. Kidane* (2021) 60 Cal.App.5th 817, 823 . . . )  In addition, [mother and Jeremy] 'failed to ensure [the children's] regular[] and consistent attendance at school.'  The petition was orally amended to allege that [mother and Jeremy] did not provide 'adequate dental care' for D.H.'s 'broken tooth.'

"DSS's section 387 report, dated April 25, 2022, was prepared by Valerie Amador, a social worker. . . .

" . . .

"The section 387 report emphasized the children's school absences and deficient academic performance . . . .

"A note from B.B.'s school said, 'As of Wednesday, March 30, 2022, [B.B.] has been absent from school for 57 days and present for 77 days.  This is equivalent to [B.B.] being present 57% of the days this school year.'  'Of [B.B.'s] 57 absences, [only] 5 of them (3/22-3/28) were excused by a doctor's note.'  '[B.B.] currently has 2 Bs, 1 C, 1 D, and 2 Fs with teachers excusing the majority of assignments from when she was absent.'

"The section 387 report continued: 'On March 29, 2022, the mother became escalated when advised of the intent to file a petition to remove the children. . . .  The mother denied that the children had any absences [from school].  When reminded that the school . . . had asked Law Enforcement to do a welfare check due to the number of absences the mother "exploded" and stated that was "bullshit" . . . .  The mother continued to yell, walking away . . . and stating that [Amador] just wanted to take the children away.'

"  '. . .

"The [children's] school informed Amador that the children have 'dirty nails and unkempt hair.'  Amador personally observed '[t]he same kind of thing.  Just unwashed hair, unkempt nails. . . .  Just an uncleanliness, in general.'

"  '. . .

"As to [mother's] participation in random drug testing, Amador testified: 'From April 4th [2022] to now [April 27, 2022], mother has tested approximately seven times.  Three of those have been negative.  Three have been positive for THC. . . .'

"  '. . .

6

" . . . Mother testified that she had received a mental health diagnosis of '[b]ipolar disorder and episodes of depression' along with 'other specified trauma.'  In addition, she 'suffer[ed] from fibromyalgia, as well as endometriosis and PTSD [Post-Traumatic Stress Disorder].'  According to the prior jurisdiction report filed on September 14, 2020, mother 'shared that she [had been] diagnosed with . . . Generalized Anxiety Disorder, Social Anxiety, Agoraphobia, and Borderline Personality Disorder.' "

*Factual and Procedural Background for Period after*
*April 2022 Order Removing B.B. from Mother's Custody*

An 18-month hearing was originally scheduled for October 27, 2022.  In a Status Review Report prepared by Amador and dated October 9, 2022, DSS recommended that mother's family reunification services be terminated and that B.B. be reunified with C.M., her presumed father.  Amador noted that B.B. was currently in a "short-term foster placement."

As to the condition of mother's home, Amador observed: "The mother does attempt to clean the home when she knows [Amador] will be visiting the home but admits that she sometimes is not well enough to keep up with the home." "During [Amador's] last scheduled home visit, [she] noted a broken window at the front of the house, which [DSS] previously paid to repair.  The home smelled strongly of sweat but the mother had the door open and fan on and was attempting to air the house out.  [Z.M.], [B.B.'s] adult sibling, showed [Amador] her room, which she shares with [B.B.] and [D.H.].  The room was exceptionally cluttered and there were items stacked up on the beds.  The bedroom had a strong smell of body odor and pets. . . . [T]he family does not appear to have windows that open and . . . it is difficult for them to air out the house."

7

As to mother's physical health, Amador noted: "[M]other has stated she becomes bedridden when her fibromyalgia flares up. [She] will need to be able to articulate a plan for when she is too ill to provide care for the children."

As to substance abuse, Amador stated: "[M]other did test for 60-days during April and May 2022. During that time, the mother attended all requested drug tests. She tested 13 times with 7 negative tests and 6 positive tests for tetrahydrocannabinol (THC)."

Amador further observed: "[B.B.] is l4 years old and wishes to remain in her community near her mother, siblings, and friends [in San Luis Obispo County]. However, the father, [C.M., who lives in Bakersfield,] has completed his case plan, is visiting consistently, and is able to provide for all of [B.B.'s] needs. [C.M.] supports [B.B.'s] continued contact with family members and her community and is willing to ensure that she is not isolated from her connections. [DSS] is confident that [C.M.] will make [B.B.] available for visitation with the mother if she is placed with him."

In a report dated October 24, 2022, the Court Appointed Special Advocate (CASA) expressed concern about placing B.B. with C.M.: "I worry most about the further deterioration of [B.B.'s] emotional and developmental state if she were to be permanently moved to Bakersfield, away from the family, school, and routines she has been around her entire life. [B.B.] has been very clear about not wanting permanent placement in Bakersfield with her father, but I am encouraged by her desire to want to continue bi-monthly weekend visitations with him. [C.M.] has demonstrated great consistency in his visitation schedule and ability to transport her." The CASA recommended that family reunification services be terminated for mother and

that "[B.B.] be placed with maternal grandmother, [D.B.], if she is approved for placement."

As to the condition of mother's home, the CASA wrote: "While nearly all of the debris and trash have been removed from the front exterior of the mother's home, I do not know what the state of the home is inside. In the past, the girls have stated that their bedroom required repairs and that they were moved to sleeping in the living room."

In a First Addendum Report dated December 6, 2022, Amador stated: "[B.B.] has been placed with her maternal grandmother, [D.B.], since October 24, 2022. [B.B.] is content with being placed with her grandmother. . . . [¶] [DSS] has received concerns that [B.B.'s] hygiene has declined since being placed with [D.B.]. . . . [D.B.] resides with her boyfriend in his home. The boyfriend is reported to have significant health issues. Should anything happen to the boyfriend, [D.B.] would not be able to remain in this home with [B.B.]."

Amador noted that B.B.'s eight-year-old sibling, D.H., was distressed because mother had been talking to her about the dependency case and had been pressuring her to lie. Amador said: "[DSS] is worried that the mother may also be coaching and influencing [B.B.] in a similar manner. [¶] [DSS] is requesting that all of the mother's visitation return to supervised immediately until the resolution of the contested [18-month] hearing." "[DSS] continues to believe that the mother has not made substantial or consistent progress over the life of the case and is not in a position to reunify with her children or have reunification services extended out to the 24-month date."

9

*The 18-Month Permanency Review Hearing*

The 18-month hearing occurred on December 20, 2022. Eight days before the hearing began, B.B. met with the juvenile court judge and said she preferred to live with mother.

Mother, C.M., and Amador testified at the hearing. Amador opined, "'The mother continues to take no responsibility for her actions that led to the children's three removals [from her custody] and continues to believe that the children were wrongfully removed.'"

After listening to the testimony, the trial court said: "[S]ometimes mature 14-year-olds can write their own ticket and the Court will follow what they want. And I know . . . what [B.B.] wants. [She] has expressed . . . that her first preference would be to be placed with mom. But . . . it's just not an option" because of (1) concerns about mother's mental and physical health; (2) mental health counseling for mother is "still in its infancy"; (3) B.B. has "been removed from [mother's] home several times . . . [a]nd [she is] entitled to some level of permanency"; (4) "this . . . case is almost two and a half years old," and "we should have had some resolution of this a year ago at least"; and (5) mother put pressure on D.H. "to lie." Mother showed "poor judgment in involving [D.H.] in this conversation [about lying] that no eight-year-old should have to have."

The juvenile court concluded: "I just can't see my way clear to give [mother] another chance. There's just too much of a risk to these children. And it's based on . . . [mother's] conduct or . . . lack of progress over the last two years. [¶] So the Court is going to terminate reunification services to [her]."

As to C.M., the court said: "He has completed his case plan successfully. . . . He is [B.B.'s] father. He is entitled to be

10

reunified with [her]. [¶] So I am going to order that [B.B.] be placed with her father . . . . [It's] in the best interest of the child." "[W]hat's good about [C.M.] is that he has vowed to make sure that [B.B.] maintain relationships with . . . the other people in [her] life."

The juvenile court's written findings stated, "By a preponderance of the evidence, the return of the child to . . . her parent . . . would create substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

*Substantial Evidence Supports the Juvenile Court's*
*Order Refusing to Return B.B. to Mother's Home*

At the 18-month permanency review hearing, "the court shall order the return of the child to the physical custody of their parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to their parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).

"We review the juvenile court's finding of detriment for substantial evidence. [Citations.] Under that standard we inquire whether the evidence, contradicted or uncontradicted, supports the court's determination. We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings and may not substitute our deductions for those of the juvenile court. [Citations.] However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*Georgeanne G. v. Superior Court of Los Angeles County* (2020) 53

11

Cal.App.5th 856, 864-865.) "An appellate court does not reweigh the evidence." (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165.)

Mother "has the burden of showing the . . . finding [of detriment] is unsupported by substantial evidence." (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598.) She has not carried her burden. The evidence shows mother failed to make meaningful, significant progress toward alleviating the problems that had led to the removal of B.B. from her custody. Although the condition of mother's home has improved, it remains unsatisfactory. Her substance abuse continues. At the 18-month hearing, mother testified that she currently uses marijuana a "[c]ouple times a week."

Mother suffers from various mental health problems. Her 2020 "original case plan . . . said that she would be expected to participate in a mental health assessment with county mental health." Amador testified, "The [purpose of the] assessment is to determine what therapeutic services are needed, whether that's a referral for a weekly therapy, whether it's a referral for a psychiatrist's med evaluation, et cetera . . . ." Mother delayed participating in such an assessment until October 2022. The court asked Amador, "Do you know why there was not a behavioral health assessment that took place between 2020 and September or October 2022?" Amador replied, "I have been the [social] worker for the past two years, and . . . [mother] did not wish to engage in [her] case plan, so it took [her] quite a while to start engaging."

Furthermore, mother showed extremely poor judgment when she discussed the dependency case with eight-year-old D.H. and pressured her to lie. These incidents led Amador to "have concerns" about mother's "mental health."

12

Amador also had concerns about B.B.'s education if she were returned to mother's home: "[A]ll throughout the life of the case, education has been an ongoing concern, so I would [have such concerns], yes.  I have not observed anything . . . that would change my mind about whether or not education would be addressed if [B.B.] was returned home [to mother]."

We recognize that B.B. wanted to be placed with mother.  But B.B.'s placement preference is not controlling.  (See *In re John M.* (2006) 141 Cal.App.4th 1564, 1570 ["By the time of the dispositional hearing, John was nearly 14 years old.  While, at that age, he was entitled to have his wishes considered, he was not entitled to decide where he would be placed"].)

*Mother Failed to Show that the Juvenile Court*
*Erroneously Terminated Reunification Services*

Mother claims the juvenile court erroneously terminated reunification services at the 18-month hearing.  "[T]he dependency law establishes a detailed timeline for reunification. . . .  Parents of children three or older are presumptively eligible for at least 12 months of services.  [Citation.]  Reunification services are ordinarily provided for a maximum of 18 months after a child has been removed from parental custody." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 625 (*Michael G.*); see *id.* at p. 627 ["the law sets a presumptive 18-month limit on reunification services"].)

"[S]ection 366.22, subdivision (b) authorizes a further extension after 18 months for three narrowly defined categories of parents who have faced specified obstacles to reunification: (1) a parent making progress 'in a court-ordered residential substance abuse treatment program'; (2) 'a parent who was either a minor parent or a nonminor dependent parent at the time of

13

the initial hearing'; and (3) 'a parent recently discharged from incarceration, institutionalization, or the custody of the United States Department of Homeland Security.' [Citations.] But even for parents falling within this narrow exception, an extension is not automatic. The parent must be making 'significant and consistent progress' either in the substance abuse treatment program, if applicable, or in establishing a safe home for the child. [Citation.] Further, the court must decide (1) that extending services would be in the 'best interests of the child,' and (2) either that there is a 'substantial probability' that the child will be returned to the parent's custody and safely maintained in the home during the extension period, or that 'reasonable services have not been provided to the parent.' [Citation.] If these conditions are not met, then the usual timeline set forth in section 366.22, subdivision (a)(3) governs." (*Michael G.*, *supra*, 14 Cal.5th at p. 628.)

Despite the above statutory restriction on extending reunification services beyond the 18-month time limit, "the juvenile court does have the discretion under section 352 to continue a section 366.26 permanency planning hearing — and in the meantime, to extend reunification services past the 18-month mark — in extraordinary cases. Before granting the extension, however, the court must determine that the extension, and the resulting delay to the child's permanent placement, is not contrary to the child's interests." (*Michael G.*, *supra*, 14 Cal.5th at p. 634.)

Mother does not contend she fell within the section 366.22, subdivision (b) exception to the 18-month time limit for reunification services. Nor does she contend that the juvenile court abused its discretion under section 352 in not extending the

14

time limit.  Mother does not say she asked the court to exercise its discretion under this section.  Accordingly, she has not carried her burden of demonstrating that the juvenile court erroneously terminated reunification services at the 18-month hearing. "'"[A]n appealed judgment is presumed correct, and appellant bears the burden of overcoming the presumption of correctness.". . . "'" (*Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 277.)

*Mother Failed to Show that the Juvenile*
*Court Erred in Placing B.B. with C.M.*

Mother argues that the trial court's order "forcing . . . B.B. to reunify with C.M. . . . [was] unsubstantiated by the evidence, and not in the best[] interests of B.B."  "[O]nce the noncustodial parent has requested custody, . . . the party opposing placement must show that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child.  [¶]  We review the juvenile court's finding that the [child] would not suffer detriment for substantial evidence." (*In re Liam L.* (2015) 240 Cal.App.4th 1068, 1087.)

Substantial evidence supports the juvenile court's finding that B.B.'s placement with C.M. would not be detrimental to her safety, protection, or physical or emotional well-being, but instead would be in her best interest.  DSS's Status Review Report dated October 9, 2022, stated: "[C.M.] has complied with and completed his case plan requirements.  [He] has demonstrated the ability to meet [B.B.'s] needs as evidenced by his successful trial visit [with her at his home in Bakersfield] from June 10, 2022, through July 29, 2022.  During the trial visit, [C.M.] was able to enroll [B.B.] in school, ensure her attendance and follow up with school officials.  He was able to stay on top of

15

[B.B.'s] appointments and was willing to transport her back to San Luis Obispo County for her medical appointments. [C.M.] was able to meet her basic needs and provide her with a safe and stable living arrangement. [He] was able to ensure that [B.B.] had access to her friends and family members. [¶] . . . [¶] [DSS] did not refer [C.M.] to parent education program during this review period as he has demonstrated exceptional parenting skills."

*Mother Forfeited Her Claim that the Juvenile Court*
*Erroneously Required Supervised Visitation with B.B.*

Because mother had spoken to D.H. about the dependency case and had pressured her to lie, DSS requested "that all of the mother's visitation [with D.H. and B.B.] return to supervised immediately until the resolution of the contested [18-month] hearing." Mother claims that at the 18-month hearing the juvenile court erroneously required "that visitation [of B.B.] with the mother be supervised." She requests that we "vacate [this] unsubstantiated requirement."

The claim is forfeited because mother does not cite any portion of the record in support of the allegedly "supervised" visitation order. "When an appellant's brief makes no reference to the pages of the record where a point can be found, an appellate court need not search through the record in an effort to discover the point purportedly made. [Citations.] We can simply deem the contention to lack foundation and, thus, to be forfeited." (*In re S.C.* (2006) 138 Cal.App.4th 396, 406-407.) The reporter's transcript of the 18-month hearing shows that DSS recommended that mother's visitation with B.B. "not be supervised."

*Disposition*

The orders appealed from are affirmed.

16

NOT TO BE PUBLISHED.

YEGAN, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

Brian R. Aronson, Judge

Superior Court County of San Luis Obispo

_____

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rita L. Neal, County Counsel, Ann Duggan, Deputy County Counsel, for Plaintiff and Respondent.